[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This dissolution action was filed in 1997. The parties have been involved in protracted and involved litigation for several years concerning the distribution of the marital estate, custody issues and visitation rights. During the pendency of this case, there have been numerous motions, at least two applications for restraining orders, and various conferences. The trial of the matter extended over a six month period. By the end of evidence the exhibits had reached quadruple letters. Both parties and their counsel have devoted substantial time and energy to this matter. The court acknowledges that this investment reflects the seriously held convictions and beliefs of the parties in their respective positions. Having reviewed the evidence in the form of testimony and exhibits, having considered the relevant and pertinent prior proceedings, and having considered all the requisite legal criteria, the court hereby renders its decision. CT Page 4992
The plaintiff and the defendant intermarried on July 4, 1981. They each have has resided continuously in the State of Connecticut for more than one year prior to the filing of this action. The plaintiff and the defendant have one minor child, born November 25, 1986. There have been no governmental funds contributed toward the support of this family.
The parties appeared at trial and each testified. The court observed their demeanor and evaluated their credibility. In addition, voluminous exhibits were introduced, most of which related to financial issues. Each party submitted sworn financial affidavits and written claims for relief. The court has jurisdiction, and all statutory stays have expired.
The court finds the following facts. The parties were married on July 4, 1981. At the time of their marriage, the plaintiff had custody of a minor son from a previous marriage. The couple and the plaintiff's son initially lived in a home in Wallingford purchased by the defendant prior to marriage. Approximately one year after the marriage the couple purchased another, larger home on Foster Court in Cheshire. The purchase price was $159,000. The defendant used $50,000 from his pre-marriage savings towards the purchase of the Cheshire house. He also used money from the sale of the Wallingford house to pay for the house on Foster Court. During the course of the marriage both parties invested in the house and caused many improvements to be made. The house has now more than doubled in value.
Regarding work history the court finds the following. Both parties were continuously employed during the course of the marriage. The plaintiff earned a Master's Degree in Public Health and was employed primarily as a health care consultant. The defendant earned a Master's Degree in Business Administration and was employed primarily as a nursing home administrator. The plaintiff, though unemployed in her chosen field at the time of the trial, was self-employed in businesses she cultivated to provide her with additional income. The plaintiff had established two hobby businesses, a Stamping business and a Costuming business, which she continued and relied upon when her Consulting business failed to thrive. At the beginning of the trial the defendant was employed at United Methodist Homes of Connecticut as an administrator. Before the conclusion of the evidence, the defendant was laid off from that position and was unemployed. Following his termination he received a lump sum payment of $45,000 pursuant to a severance agreement which also continued his insurance to March 31, 2001. After the conclusion of the trial the plaintiff obtained full-time employment from her former employer, Aetna. In her new position she earns $72,000 per year and has family medical benefits available through her job, as well.
As for the general health of the parties the court finds that both CT Page 4993 parties are in good health with minor long-standing problems. Specifically, the plaintiff suffers from asthma, which does not interfere with her employment; and the defendant suffers certain orthopedic problems and gastrointestinal discomforts. Despite the fact that the defendant dramatized these health conditions during the trial, through counsel he is apparently making no claim that they should or would prevent him from securing full-time employment in his chosen field. In his trial brief, the defendant wrote: "Mr Milton's health is generally good except that he suffers chronic back pain, and has pain in his right wrist and knee. His back pain is at times debilitating requiring him to lay down during the day to obtain relief. He also has digestive problem."Defendant's Trial Memorandum, November 24, 2000, p. 2. Despite the painful conditions, the defendant concedes that "[t]he parties have similar education and their employability is probably the same."Defendant's Trial Memorandum, November 24, 2000, p. 10. Based upon the evidence submitted, the court does find that the plaintiff's current income equals her earning capacity and that the defendant's earning capacity is equivalent to his salary at the time of the commencement of the trial, which is $90,000 per annum.
During the marriage the parties accumulated and impressive estate, given their respective incomes. The parties jointly own a home in Cheshire. At the time of the purchase of the house, the defendant applied $109,000 that he had accumulated prior to the marriage towards the purchase of the house. Prior to the marriage the plaintiff owned a Camaro which she sold during the marriage, according to her testimony, for approximately $7,000. In her brief she claims that this money was used towards the purchase of the house. The parties dispute the value of the house. The plaintiff relies on the opinion of her appraiser that the fair market value of the house is $325,000. The defendant testified that the house should be valued at least at $375,000. He based this opinion on his experience as a nursing home administrator. The court finds the evidence presented by the plaintiff to be more credible. The value of the Foster Court home is $325,000. There was reference during the trial to a Zurich account in the name of the defendant containing approximately $50,000. Although in a brief the defendant disputed the existence of this account, during the trial, the defendant conceded that this money market account did exist; was funded by his mother; and would require the filing of an amended return to include the income generated from it. Therefore, the court finds that the marital estate consists of the following: the Foster Court home, valued at $325,000; the plaintiff's pensions, valued at approximately $296,602; the defendant's pensions, valued at approximately $297,262; a money market account in the name of the defendant valued at $50,000; two Dodge Caravans; Bonds, owned in the name of the plaintiff's consulting business, valued at approximately $19,000; inventory for the plaintiff's business, worth approximately $16,000; and CT Page 4994 personal property.
One of the reasons the plaintiff gives for the breakdown of the marriage is the defendant's refusal to share with her financial information. She claims that while they were married she did not know where or how the money the parties earned was used. During the trial the plaintiff attempted to illicit from the defendant information about accounts in his name. She intimated that the defendant has not been forthcoming in disclosing all of his assets. She apparently believes that the defendant has taken and hidden marital funds. Despite this belief, which based on the demeanor and testimony of the defendant seems reasonable, the plaintiff has been unable to prove the existence of accounts or assets belonging to the defendant other than those listed above.
The defendant seeks the return of the pre-marital funds that he invested in the house. He also seeks possession of the house. The plaintiff argues that the defendant is not entitled to a return of the $109,000 because she, too, invested substantial funds in the house. The plaintiff's argument fails, however because she fails to acknowledge that the $80,000 she claims to have paid for repairs was spent during the marriage. While this court agrees, having considered all the evidence, that the plaintiff should be awarded the house, it disagrees that the defendant is not entitled to reimbursement of premarital funds.
The defendant has made claim to unspecified personal property. The plaintiff itemized and inventoried the personal property in the house, including personal property which was previously granted to the defendant by court order, but which he has refused to retrieve. During his testimony the defendant declined to go through the specific lists of property, and stated that he would make specific requests through counsel. No specific requests were made. Rather, the defendant, through counsel, requests general categories of property. The court, therefore declines to make specific designations of personal property division, other than those previously ordered and an order for the return of any items of clothing the defendant left in the house. The court deems it equitable to allow the plaintiff to keep all personal property which was not previously granted to the defendant by previous court order in light of the other asset distributions.
Through gifts and thrift, the parties were able to fund Uniform Gift to Minors Act Accounts ("UGMA" Accounts) for the plaintiff's son and the parties' daughter worth approximately $850,000. The plaintiff claims that she did not know about these accounts because the defendant was secretive and manipulative in funding them. She is not, however, making any claim that the funds from the accounts should be returned to her. CT Page 4995 Consequently, although marital assets may have been used to establish the accounts, they are not apart of the marital estate.
The parties have one minor child, Whitney, who is now 14 years old. Whitney currently resides with the plaintiff in the Foster Court house. She attends private school, locally. The defendant has regular visitations scheduled with Whitney. Those visitations, or the alleged lack of them, have been a source of continuing discord between the plaintiff and the defendant.
The defendant testified that during the marriage the plaintiff's job's travel demands and her hobby businesses took her away from Whitney too frequently. He also claims that he was the primary care-giver during the marriage. However, the court finds that the plaintiff balanced the demands of her jobs and her parenting responsibilities admirably. In fact, the court finds that prior to their separation, both parties were equally and actively involved in the rearing and raising of Whitney. Though they obviously exhibited different styles of parenting, this court finds that both parties exhibited love and caring toward the minor child. Post-separation, the court finds that the plaintiff again prioritized the needs of her daughter. However, after the plaintiff filed this action, the court finds that the defendant exhibited repeated behavior which placed the minor child in the middle of the dispute between the parents. This court also finds that after their separation the defendant took actions which were not in his daughter's best interest. For instance, the defendant refused to deposit checks into Whitney's UGMA account and refused to take action to ensure that taxes were filed on her behalf, even though these actions would have an adverse financial affect for Whitney. Although he could financially afford to, the defendant has stubbornly refused to fully furnish his residence, thereby depriving Whitney of the comfort to which she is entitled during her visits with him. The defendant had a two bedroom condominium but he only furnished one bedroom with a bed. When Whitney visited he slept on a futon in the living room. The defendant has sometimes refused to communicate directly with the plaintiff and instead used Whitney as a kind of intermediary. Given the evidence adduced at trial, this court concludes that the defendant's anger towards the plaintiff outweighs and interferes with the expression of his concern for his daughter. As a result the defendant, many times, acts in a manner that is not in the best interest of the child.
This court has received numerous motions regarding visitations prior to and during the trial. Each of these motions was occasioned by a complete breakdown in communication between the parties. The parties have demonstrated a complete inability to cooperate in maintaining the flexibility required to jointly raise a teenage daughter. This inability CT Page 4996 to cooperate is, in the opinion of the court, the fault of the defendant. Prior to the trial there were two sets of proceedings which the court considers germane to the issue of custody and visitation. At all of these proceedings both parties were present and given ample opportunity to examine and cross examine the witnesses and to present and challenge evidence. These proceedings were the hearings before Judge Beach on March 3, 1999 and May 13, 1999 and the proceedings before me on January 13, 2000 and April 6, 1999.
On March 14, 2001, the plaintiff filed an application for an ex parte restraining order, which request was granted. The affidavit attached to the request related facts suggesting that Whitney no longer feels safe and/or comfortable visiting with her father. The affidavit, signed by the plaintiff, indicated that there were two occasions during a three week period when Whitney called her because she was frightened. Both times she requested that her mother pick her up. The affiant also attested that she witnessed the defendant aggressively berating Whitney when he picked her up for a visit. Following this Whitney refused to go with the defendant. The affidavit states that the defendant has moved to another apartment and that he has refused to give the plaintiff the address and has refused to have a phone. Finally, the affiant alleged that the defendant had attempted to physically remove Whitney from a school musical production during the production. Following a hearing, the restraining order suspending visitation was extended for six months.
An attorney has been appointed for the minor child. The Attorney for the minor child interviewed Whitney and filed proposed orders. The parties each request that this court order different custody and visitation arrangements. Notwithstanding the allegations in the application for restraining order dated March 14, 2001, the plaintiff and the Attorney for the minor child request that this court order sole custody to the plaintiff and reasonable visitation for the defendant. The defendant is seeking joint custody of the minor child with physical custody to the plaintiff and liberal visitation to the defendant.
Given the facts of this case, this court concurs with the recommendation of the Attorney for the child on the issue of custody. Accordingly, the court orders sole custody to the plaintiff. The issue of visitation is problematic. Pendente lite orders setting forth reasonable visitation for the defendant have resulted in numerous problems. Rigid schedules do not seem to work, nor does an open and flexible method for establishing visits by the minor child with the defendant. With certain conditions, the court does grant reasonable rights of visitation as to the minor child, with that visitation to take place every other weekend, one evening during the week and at the convenience of the plaintiff, defendant and minor child, upon a minimum of(96) hours notice to the CT Page 4997 plaintiff. The court sets forth specifics regarding the visitation schedule below in the order section.
The plaintiff claims that the marriage broke down because of inadequate and insufficient communication between the parties and because of the verbally aggressive and abusive style of communication of the defendant. She is not, however, claiming significant fault grounds for the break down of the marriage. The defendant testified that he does not believe that the marriage has broken down. The court has assessed the evidence in the case, and cannot find that either party has engaged in any conduct which could be considered fault. The breakdown of this marriage occurred over time.
The court has reviewed the evidence presented, along with the exhibits which have been admitted on behalf of the respective litigants, and has applied those facts to the statutory criteria. The court has heard the arguments of counsel, and reviewed the post-trial briefs.
The court makes the following orders with respect to the disputed issues of this dissolution:
(1) REAL PROPERTY: The Husband shall quit claim to the Wife all of his right, title and interest in and to the real property which is jointly owned by the parties which is known as, and located at, 772 Foster court, Cheshire, Connecticut (hereinafter the "Foster Court Premises"), and the Wife shall hold the Husband harmless from and against, and indemnify the Husband against, any encumbrances standing against the interests of the parties in the Foster Court Premises, as well as the obligations underlying such encumbrances, except that the parties shall pay equal amounts of any IRS lien that has been placed on the property. The Wife shall simultaneously execute and deliver to the Husband a negotiable mortgage note, secured by the Foster Court Premises, in the amount of $200,000 (two hundred thousand dollars) which shall:
 a) Contain the provisions usually contained in such notes (including provisions for the payment by the Wife of attorney's fees and costs of collection in the event of default);
b) Bear interest at the rate of 2 % per annum;
c) Be payable, in full upon the earliest to occur of any of the following:
(i) The remarriage of the wife; CT Page 4998
(ii) The transfer, by the Wife, of the Foster Court Premises;
(iii) The death of the Wife; or,
 (iv) Such time as the Foster Court Premises is no longer the principal residence of the Wife when she is receiving child support from the Husband.
(2) PENSIONS: Each party shall retain their respective pensions free and clear of any claim from the other. The court finds that the mutual QUADRO's are not necessary to effect an equitable distribution of the marital estate, in light of the other property distributions and the fact that the parties' pensions are roughly equivalent.
(3) BANK ACCOUNTS: The parties shall retain the moneys in the accounts bearing their names.
(4) DEBTS: The parties shall each be responsible for the debts listed on their respective financial affidavits, and hold the other harmless therefrom. The parties will each be responsible for 1/2 (one half) of any IRS tax lien placed on the Foster Court premises. The parties shall each be responsible for their respective counsel fees. The parties are each responsible for 1/2 (one half) of the fees of the Attorney for the minor child. Those fees, due to Attorney Zullo, amount to $18,478.55. The plaintiff is to pay cost and fees associated with the testimony of the real estate appraiser.
(5) PERSONAL PROPERTY: The plaintiff shall retain items designated as inventory for her stamping and costuming businesses. The defendant shall have the personal property which was previously granted to him by court order. The defendant shall also have any items of his clothing that were left in the house upon his leaving. He shall retrieve those items within thirty (30) days, at a time that is mutually convenient for the parties. The property shall be removed on a date and time as arranged through counsel. The property will be placed in the garage and shall be removed by the defendant and/or his agents. The defendant shall not enter any other part of the Foster Court premises to seek or remove property. In the event that the defendant fails to retrieve the items within thirty (30) days of this judgment, the defendant forfeits the property. Upon forfeiture of his right to retrieve the property, the court grants the plaintiff the right to the property.
(6) AUTOMOBILES: Each party shall retain possession of the motor vehicle they currently drive. The plaintiff will convey to the defendant CT Page 4999 her right, title, and interest in and to the vehicle operated by the defendant and the defendant will convey to the plaintiff his right, title, and interest in and to the vehicle operated by the plaintiff. The parties shall pay all title and tax charges that apply to the respective vehicles.
(7) CUSTODY: The plaintiff shall have sole custody of the minor child. The defendant shall have reasonable visitation. Such visitation shall be as follows: every other weekend from Friday evening at 6 p.m. to Sunday evening at 6 p.m.; every Wednesday evening from 5 p.m. to the next morning (on Thursdays the defendant will be responsible for ensuring that Whitney arrives at school on time; in the event she is ill or cannot attend school for any other reason, the defendant will be responsible for returning her to the care of the plaintiff and/or the plaintiff's designee by 8:30 a.m.); and at the convenience of the plaintiff, defendant and minor child, upon a minimum of(96) hours notice to the plaintiff The defendant is also granted visitation on Father's Day and his birthday from 4 p.m. to the following morning at 8:00 a.m. The parties will alternate the Thanksgiving, Christmas, Easter, Memorial Day, Independence Day and Labor Day. The plaintiff will have Thanksgiving, Easter and Independence day in 2001, and the defendant will have Christmas, Memorial Day and Labor Day in 2001. The parties will also alternate the minor child's birthday. Each party will have the minor child on her birthday from 5 p.m. to 9 p.m. (For example the plaintiff will have Whitney on her birthday in 2001 from 5 p.m. to 9 p.m.; the defendant will have Whitney on her birthday in 2001 from 5 p.m. to 9 p.m.) The defendant will have the minor child for two weeks during the summer. The two weeks need not be consecutive, however, they must be arranged in writing by May 15 each year. Visitation with the minor child is contingent upon the defendant doing the following: a.) Furnish one bedroom, other than the one in which the defendant usually sleeps, with a bed, dresser and desk to be used by Whitney when she visits; b.) Furnish his residence with a table and at least two chairs upon which to eat meals; c.) Maintain working phone service (other than cellular phone service) in the apartment at all times that Whitney is visiting; d.) Provide the plaintiff with the telephone number in his residence at all times; e.) Allow the minor child access to the telephone at all times during her visits with him; and f.) Provide the plaintiff with his current address at all times. The defendant is not authorized to take the minor child out of the state without obtaining prior permission. The plaintiff is given the right to claim the minor child as an income tax exemption.
(8) CHILD SUPPORT: Child Support is ordered in accordance with the child support guidelines based on the amount of income reported by the plaintiff on her most recent financial affidavit and the earning capacity CT Page 5000 of the defendant of $90,000 per year. The defendant shall pay $172.80 per week until the Whitney reaches the age of 19 or graduates from high school, whichever comes first. The court orders a wage execution at such time as the defendant obtains employment. The defendant is ordered to inform the plaintiff when he obtains employment of any kind. The defendant is also ordered to provide the plaintiff with all the requisite information for her to obtain a wage execution. The parties are each to provide medical insurance for the minor child as available through their places of employment. The parties will split cost for unreimbursed medical, dental, prescriptive, counseling, optometric, orthodontic expenses equally. The parties will share equally the educational expenses of the minor child, including tuition for school until the minor child graduates from high school.
Robinson-Thomas, J.